**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No.: _____

MARK R. NICASTLE,

      Plaintiff,

v.

ADAMS COUNTY SHERIFF'S OFFICE, and
SHERIFF DOUGLAS N. DARR, in his official and individual capacity.

      Defendants.

---

## VERIFIED COMPLAINT AND JURY DEMAND

---

Plaintiff, Mark R. Nicastle (hereinafter "Sergeant Nicastle" or "Nicastle"), by and through his undersigned attorney, brings this action and alleges as follows:

### INTRODUCTION

1.    This is an action for damages against the Adams County Sherriff's Department (hereinafter "the Department") and Sheriff Douglas N. Darr (hereinafter "Sheriff Darr" or "Darr"), (collectively "Defendants") for violating Sergeant Nicastle's rights under the First Amendment of the Constitution, the Fourteenth Amendment of the Constitution for conduct that is clearly against public policy and for injunctive relief. Sergeant Nicastle alleges that Defendants violated his First and Fourteenth Amendment Rights when they retaliated against him by demoting him from Lieutenant to Sergeant for the purpose of attempting to cripple his attempts to run for Sheriff in the 2010 election. In addition, the conduct of the Defendants in demoting Sergeant Nicastle for political purposes runs contrary to public policy of allowing those who seek public office

1

to do so in an unfettered manner.  Defendants' conduct under color of state law proximately caused the deprivation of Sergeant Nicastle's federally protected rights and those provided to him under state law.

2.      Sergeant Nicastle brings this action under 42 U.S.C. § 1983 for violation of his civil rights and seeks compensatory damages, punitive damages and injunctive relief against the Department as well as Sheriff Darr, in both his individual and official capacities.  Sergeant Nicastle also makes claims against the Defendants for violation of public policy clearly established within the State of Colorado and an injunction.

### JURISDICTION & VENUE

3.      This action arises under the Constitution and laws of the United States and 42 U.S.C. §1983.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.  Jurisdiction supporting Sergeant Nicastle's claim for attorney's fees is conferred by 42 U.S.C. § 1988.

4.      Venue in the United States District Court is proper in that the action complained of took place in the State of Colorado, Adams County, and all the parties are residents of the state.

### PARTIES

5.      At all pertinent times mentioned herein, Sergeant Nicastle, was and is a citizen of the United States of America and a resident of Colorado.

6.      The Adams County Sheriff's Office is an independent agency of Adams County in the State of Colorado.

7.      At all pertinent times mentioned herein, the individual Sheriff Darr, in his

official and individual capacities, was the duly elected Sheriff of the Adams County
Sheriff's Office.  At the time of Sergeant Nicastle's improper demotion, Sheriff Darr
served as the sole decision maker as a result of his unilateral decision to amend the
Department's policies and procedures as it relates to discipline against command staff.

## FACTUAL ALLEGATIONS

8.      Nicastle has been employed by the Department for over 30 years, and
was a Lieutenant from 1999 to 2008.

9.      Nicastle was demoted from the rank of Lieutenant to Sergeant by the
Department on July 16, 2008, for purported performance and conduct issues.  The
demotion and related Internal Affairs investigations were headed up and zealously
pursued by Darr.

10.     The background of events leading up to the demotion is informative as to
the reasons for Nicastle's wrongful demotion and related violations of his civil rights.  As
will be seen, Nicastle's demotion was motivated by Darr's political aspirations and his
quest to retaliate against Nicastle.

11.     In 2002, Darr was running for the position of Sheriff in Adams County.  At
that time Darr advised Nicastle that he was planning to run for Sheriff and asked for
Nicastle's support.  Nicastle did support Darr in his bid for Sheriff and Darr won the
election.

12.     During his campaign, Darr utilized Department vehicles on paid
Department time to attend political/charity events.  In addition, Darr allowed others to
use their company vehicles to escort him to political appointments and introductions.  It

was a general understanding that Department vehicles were being employed for their intended purposes so long as the employees driving them were ready to respond at a moment's notice.

13.     Darr campaigned at various charity events, including galas, golf tournaments and luncheons through Metro North Chamber, C.A.S.A. Community Reach and other entities.

14.     During his first year in office as Sheriff, Darr hinted to Nicastle that Nicastle was the choice candidate to run for Sheriff as Darr's successor once Darr completed his second term service as Sheriff.  At the time there was a term limit for Sheriffs of two years.

15.     Later in 2003, and through 2006, the relationship between Darr and Nicastle deteriorated for reasons that were not initially understood by Nicastle.  Nicastle noticed that Darr would no longer make eye contact with him, showed non-verbal cues that created distance between them and did not treat him as a trusted colleague and friend.

16.     When Nicastle addressed the change in Darr's attitude toward him, Darr informed Nicastle that he needed to be "more regal."

17.     Even though there were issues between the two men, upon Darr's request and in an effort to repair their strained relationship, Nicastle assisted Darr in getting reelected as Sheriff in 2006.

18.     In October 2006, Nicastle was advised by Sergeant JJ Long, Sr., that Darr was using Department vehicles to place campaign signs under the cover of night.

Sergeant Long further advised Nicastle that various news media outlets were interested in this information. Nicastle contacted Darr about this and asked him if it was true. Darr denied it to Nicastle and later assured Undersheriff Siska and Captain McIntosh that he had not used Department vehicles to place campaign materials. Darr then contacted Paula Woodward at 9News who had contacted Darr's office and was interested in speaking to Darr about his use of Department vehicles to place campaign signs. Darr informed Ms. Woodward that if she could produce proof of this he would step down from his campaign. At that time Woodward did not have such proof. However, in approximately 2008 Martin Amarillas approached Nicastle and directed him to former Deputy JJ. Long, Jr., who provided him with a DVD of Darr placing campaign signs using a Department vehicle in October 2006.

19.     In November 2006, Darr was reelected as Sheriff with Nicastle's assistance.

20.     In December 2006, Nicastle approached Darr in the F.O.P. parking lot and asked him why their relationship had deteriorated. Nicastle asked him if it was because Darr no longer supported Nicastle in his bid to succeed Darr as Sheriff, but was instead supporting Roger Englesman (hereinafter "Englesman"). Nicastle indicated to Darr that he was still planning to run for Sheriff. A heated argument ensued after Darr repeatedly denied that he was supporting Englesman as his successor for Sheriff. Later in that conversation Darr finally admitted that he was supporting Englesman. At that time Nicastle indicated that he did not have a problem with Darr supporting Englesman but he requested that Darr refrain from taking any action that would wrongfully affect

Nicastle's career and bid for Sheriff.  Nicastle feared that Darr would use his power and position to do just this.

21.     On December 21, 2006, Nicastle suffered a heart attack that caused him to miss approximately two weeks of work.

22.     Only three days after Nicastle returned to work in January 2007, and three weeks after the confrontation in the F.O.P. parking lot, Darr personally initiated an I.A. investigation of Nicastle, purportedly based on his abuse of a Department vehicle and for political activities while on duty as well as six additional charges of which five Darr found Nicastle guilty (see below).  Darr personally typed the I.A. investigation complaint and appointed his good friend Captain Craig Coleman (hereinafter "Coleman") to head up the investigation.

23.     The investigation began when Nicastle traveled to meet Pat Moore, the head of the Democratic Party, for lunch in a Department vehicle in January 2007.  It has been a long-standing Department policy that use of Department vehicles in this manner was allowed, and Darr himself used his Department vehicle to attend countless political events related to his bid for Sheriff.  While Nicastle was at lunch with Ms. Moore, a Democratic Party official loyal to Darr contacted Darr and advised him of Nicastle's whereabouts.  Upon learning of this information, Darr then immediately began a fishing expedition to "uncover" any other charges that he could press against Nicastle.

24.     During the 2007 I.A. investigation against Nicastle, Darr took further retaliatory steps against Nicastle.

25.     In or about February 2007, well before the completion of the I.A.

investigation, Darr unilaterally and without due process administratively sanctioned

Nicastle.  Darr determined that Nicastle should no longer enjoy the privilege of a

Department vehicle and took Nicastle's vehicle from him.  Nicastle does not have a

Department vehicle to this day.  Darr also ordered a change in Nicastle's duties.  Darr

issued an administrative order/memorandum that unilaterally prohibited Nicastle from

serving off-duty at the airport, removed him from the Metro North Leadership Advisory

Board and prohibited him from attending any other Adams County Sheriff's sponsored

events while he was on duty.  The Adams County sponsored events were nearly always

politically charged and/or provided campaigning opportunities.  Furthermore, Darr

encouraged Nicastle to attend such events with him while on duty during Darr's

previous campaigns.  Nicastle's removal from Metro North and exclusion from other

events (including political/charity events) gravely damaged his ability to promote himself

for Sheriff and hurt his reputation in the community.  Darr's new policy (which applied

only to Nicastle) was despite the fact that Darr was attending those same events during

work hours.

26.     Then, at a Fraternal Order of Police (hereinafter "F.O.P.") meeting in the

first quarter of 2007, Nicastle requested that the F.O.P. support him should he

determine to run for Sheriff in 2010, as Darr's two-term limit would be expired.  At that

time Darr stood up and advised all meeting attendees that he was working to change

the term limit laws and would be running for a third term.  Ultimately Darr was able to

influence the process to allow for a three-term limit and he obtained the ability to run for

a third term.  Darr is currently running for reelection of Adams County Sheriff in 2010.  It

should not be lost upon the Court that Englesman advised Nicastle that he planned to run for Sheriff against him in 2010 if Darr was unable to run for a third term. Englesman did not choose to run for Sheriff in 2010 due to Darr's candidacy, however Darr did appoint Englesman to be Undersheriff when Undersheriff Siska retired approximately two months ago in February 2010.

27.    In or about April 2007, three months into Darr's 2007 I.A. investigation against Nicastle, Darr unilaterally changed Department policy, effective immediately, so that the Sheriff (i.e. Darr) would determine the guilt and discipline for all Department employees with a rank higher that sergeant. This meant that because Nicastle was a lieutenant Darr would be the "judge, jury and executioner" on the I.A. investigation that he personally initiated and authored against Nicastle. After Darr changed the policy Undersheriff Siska indicated to Darr that Nicastle should not be included in the policy change for the I.A. investigation in light of the facts and events surrounding the investigation. However, Darr disregarded this and ensured that his new policy applied to Nicastle's ongoing I.A. investigation.

28.    The previous Department policy regarding I.A. processes at the time the 2007 I.A. investigation against Nicastle was that I.A. investigations were forwarded to Department captains for their recommendations regarding guilt and punishment. Then the recommendations were forwarded to the Undersheriff who would ensure consistency in the captains' recommendations and final disposition and punishment. If a Department employee disputed the outcome, the employee would then appeal to the Sheriff or an administrative board. This was a long-standing policy.

8

29.    When he finished his 2007 investigation, Coleman handed the I.A. investigation results to Department captains and Undersheriff Paul Siska (hereinafter "Siska") for their review and recommendations.

30.    When Englesman reviewed Coleman's I.A. investigation results, Englesman recommended an unpaid suspension from employment that was significantly more punitive than any of the other captains.  Undersheriff Siska recommended four days' of unpaid suspension.  All captains except Englesman recommended that Nicastle was should not be found guilty of the charge of untruthfulness, which essentially forced Darr to adopt that recommendation.   It should not be forgotten that Nicastle was in direct competition for the office of Sheriff with Darr and his cohort Englesman.

31.    Darr eventually ordered Nicastle to serve a seven-day unpaid suspension from employment in relation to the 2007 I.A. investigation.

32.    Nicastle chose not to appeal the trumped-up charges and the related discipline because his appeal would have gone directly to Darr, which would have been futile because Darr had initiated the investigation, had found Nicastle guilty and then had meted out the discipline.  Further, Nicastle believed that Darr had exacted his "pound of flesh" and would no longer pursue and retaliate against Nicastle.

33.    In August 2007, after the 2007 I.A. investigation and as a result of the previously-referenced administrative order that prohibited Nicastle from attending any other Adams County Sheriff's sponsored events while he was on duty, Nicastle requested vacation time off to attend the annual September Community Reach charity

golf tournament.  Nicastle's supervisor, James Wilbourn (hereinafter "Wilbourn"),

approved the time off well before the event.  Darr coordinated with event organizers

Belva Wildman (hereinafter "Ms. Wildman") and Deb Holgerson (hereinafter "Ms.

Holgerson") to volunteer for certain duties at the event.  Then, less than 24 hours before

the event, Darr cancelled Nicastle's vacation, citing his rule that Nicastle was not

allowed to respresent Darr or the department and charity/political events.  This not only

put even organizers in a bad position for filling Nicastle's volunteer duties, but it

damaged his ability to promote himself for Sheriff and hurt his reputation in the

community.  Darr's unreasonable actions also frustrated and angered Ms. Wildman and

Ms. Holgerson.

34.     At the 2007 golf tournament, Darr made derogatory comments regarding

Nicastle's conduct directly to Ms. Holgerson.  Darr advised Ms. Holgerson that it was

Nicastle's conduct that prevented him from attending the golf tournament.  Darr further

discussed with Ms. Holgerson specific details of his 2007 I.A. investigation against

Nicastle.

35.     Nicastle was wrong in his belief that Darr would discontinue his retaliatory

behavior after the 2007 I.A. investigation.

36.     Instead of backing off from his retaliatory behavior, Darr took even more

politically-motivated and unwarranted action against Nicastle.

37.     In early 2008, Darr again unilaterally initiated an I.A. investigation against

Nicastle.  This time it was purportedly because Nicastle had used a Department

computer for political and personal use, and had committed a violation of adherence to

standards.

38.    In accordance with Department policy, Nicastle did use a Department computer for the purpose of purchasing University of Colorado football tickets to watch his son play in the band at a game.  Nicastle also purchased a box of cigars online. These events were the basis for the charges of using a computer for personal use.

39.    Nicastle sent approximately three inconsequential emails, which were the basis for the charges that Nicastle used his computer for political purposes.  He emailed F.O.P. officials about setting up a meeting, responded to an email from his radio-controlled airplane club thanking them for their donation (at that time Nicastle was a candidate for the Colorado State General Assembly, District 30, as discussed below) and emailed retired Detective Sherry Nevin to inform her of his plans on his days off.

40.    Darr appointed Nicastle's immediate supervisor Wilbourn to complete the I.A. investigation related to the 2008 charges against Nicastle. Even though Darr brought charges against Nicastle of improper computer use, the long-standing written Department policy was that employees could use Department computers so long as their supervisors approved the use and laid out the terms of use.  Nicastle's supervisor Wilbourn had, in fact approved the use of Department computers for personal use for up to five hours per month and his investigation indicated as much.

41.    Nevertheless, Englesman completed his own fact-finding mission after receiving Wilbourn's I.A. investigation report.  Englesman contacted Wilbourn to "clarify" the items in his report about computer use.  Englesman asked Wilbourn if he specifically granted Nicastle permission to purchase the C.U. tickets and the cigars.  Wilbourn

indicated that he did not give specific permission for those items.  Based on this,

Englesman recommended that Nicastle receive 30 days' unpaid suspension from

employment and also indicated that termination would not be unjustified.

42.     Conversely, Undersheriff Siska recommended that Nicastle be exonerated

for the computer use charges and that he receive only verbal counseling for political

activities.  Siska acknowledged that Nicastle had engaged in some political activities but

that they were of no consequence and should not have been subject to sanctions.

43.    Ultimately, Darr recommended three days' of unpaid suspension from

work and advised Nicastle that any appeals would be directly to Darr. Nicastle again

chose not to appeal the charges and the related discipline because his appeal would

have gone directly to Darr, which would have been futile because Darr had once again

initiated the investigation, had found Nicastle guilty and then had meted out the

discipline.

44.     At the time of his 2008 discipline, Darr informed Nicastle verbally that he

was planning to pursue demotion against Nicastle.  He verbally provided Nicastle with

the reasons, all of which were spurious.  In fact, Darr knew that demoting Nicastle would

further damage Nicastle's bid to run for Sheriff.

45.     On July 16, 2008, Darr did demote Nicastle from lieutenant to sergeant.

Also about this time, in preparation for his run for Sheriff, Nicastle ran for a seat in the

State General Assembly.  The process of the demotion as well as the demotion itself

caused significant difficulties for Sergeant Nicastle in the primary election and he was

ultimately defeated by a narrow margin.  The demotion was politically motivated, was

based on allegations of misconduct that were unfounded, and was done in violation of Nicastle's rights as a public employee.

46.     It should be noted that on July 21, 2008, Darr drafted a Memorandum that he placed in Nicastle's personnel file, in which he cited 2003, 2007 and 2008 I.A. Investigations but also included several items that were not ever part of any I.A. investigation and had never even been addressed in yearly performance reviews. Essentially, Darr went on another fishing expedition and included irrelevant and/or untrue but potentially damaging information into Nicastle's personnel file. Nicastle never received this memorandum and inadvertently discovered it in the first quarter of 2010 when he was inspecting his personnel file for a totally separate reason.

47.     Between September 2007, when Darr prohibited and prevented Nicastle from attending the Community Reach golf tournament, and September 2009, Nicastle did not attempt to attend any charity or political events via requesting vacation time during work hours because he feared retaliation by Darr.

48.     However, in September 2009, Nicastle received an invitation to attend the 2009 Annual Community Reach charity golf tournament. Nicastle then properly requested vacation leave over a month before the golf tournament so that he could attend and his supervisor Lieutenant David Shipley (hereinafter "Shipley") granted the time off. Nicastle advised the tournament organizers that he would be attending the event and could assist with volunteer activities.

49.     Despite taking all required steps, Darr again cancelled Nicastle's vacation less than 24 hours before the golf tournament. This angered the organizers, Ms.

Wildman and Ms. Holgerson, as it again left them without the number of planned volunteers.  When Nicastle approached Darr about why he cancelled Nicastle's vacation, Darr cited his 2007 administrative order that applied only to Nicastle.  Darr advanced two reasons to Nicastle to support cancelling Nicastle's vacation pursuant to Darr's illegal administrative order: (1) Nicastle's attendance was not permitted as there would be a risk of confusion in that the general public might believe that Nicastle was representing Darr or the Adams's County Sheriff's Department at the function; and (2) Nicastle's attendance would reflect negatively on the Department due to the poor economy, as the general public would have a negative view of the Sheriff's Office if Nicastle took vacation to attend the event.  Clearly, Darr's reasoning is nonsensical at best as he generally attends the same events to which he has prevented Nicastle from attending.   At the golf tournament Darr campaigned for his own 2010 bid for Sheriff with the assistance of on-duty Sheriff's employees.

50.     The day before the 2009 golf tournament, Darr placed telephone calls to Ms. Wildman and Ms. Holgerson and made derogatory comments regarding Nicastle's character and conduct to both women.  Darr advised both women that it was Nicastle's conduct that prevented him from attending the golf tournament.  Darr further discussed on the phone with Ms. Holgerson specific details of his I.A. investigations against Nicastle.  Then at the tournament he approached Ms. Wildman and repeated many of the comments he had made the day prior regarding Nicastle.  Ms. Holgerson overheard Darr's comments to Ms. Wildman at the tournament causing her to remove herself from the area because Darr's actions made her uncomfortable.

51.    After Nicastle challenged Darr on his actions, Darr took Shipley aside and informed him that if Nicastle ever spoke to him "that way" again he would fire Nicastle.

52.    At that point Shipley and Captain Michael McIntosh (hereinafter "McIntosh") took Nicastle aside and told Nicastle that from that point forward Nicastle would have to inform them of his exact vacation plans before he was granted any vacation time.  Darr, realizing that this would look bad for him, advised Shipley and McIntosh that they should cancel that policy and allow Nicastle's requested vacation time and that Darr would no longer cancel the vacation time.  However, it was clear to Nicastle that his job would be in danger if he dared to show up at any of the charity/political events where Darr was attending even if Nicastle had approved vacation.

53.    In November 2009, Ms. Wildman extended an invitation to Nicastle to attend a C.A.S.A. fundraiser luncheon, which would have be a valuable event for campaigning.   Nicastle then emailed Darr and asked if attending would violate the previous 2007 administrative order regarding his attending of events. (*See* Exhibit 1, Email from November 17, 2009).  Darr indicated that the previous administrative orders were still in place, which meant that Nicastle should not attend. (*See* Exhibit 1, Email from November 17, 2009).  After the email exchange Nicastle chose not to attend the luncheon because he feared the loss of his job.

54.    In December 2009, Nicastle "officially" announced his intention to run for Sheriff in Adams County in 2010, even though he had announced it repeatedly since 2007.

55.     Since that announcement, Nicastle has been invited to an upcoming C.A.S.A. golf tournament to be held May 19, 2010.  He has requested vacation time off and believes that it will be approved.  Elections for Sheriff are this coming November and the tournament will be an invaluable opportunity for any candidate for Sheriff. Unfortunately, Nicastle gravely fears for his job if he should choose to attend the event or any other like it.  Darr will be attending the event and campaigning for his bid for Sheriff there and at other events.  Nicastle's ability to attend the May 19, 2010, golf tournament and other future events without facing retaliation or job loss is the basis for the requested injunctive relief, which is alleged below and is addressed in a contemporaneously-filed Motion for Injunctive Relief.

56.     The demotion of Sergeant Nicastle from Sergeant to Lieutenant dated July 16, 2008, is the basis for Sergeant Nicastle's retaliatory demotion claim.

57.     Notice Pursuant to the Colorado Governmental Immunity Act, Colorado Revised Statutes section 24-10-109, was sent via registered mail on December 18, 2008 and was received by the Adams County Attorney's Office on December 22, 2008. To date, no response to the Notice has been received by Nicastle.

58.     As a result of the unlawful actions of the Defendants, Nicastle has suffered substantial injury in the form of lost earnings, lost benefits, loss of reputation, psychological and physical manifestations and significant financial injury.

59.     As a result of the unlawful actions of the Defendants, Nicastle has also suffered a deprivation of his constitutional rights.

## FIRST CAUSE OF ACTION – 42 U.S.C. §1983 FIRST AMENDMENT VIOLATION – RETALIATION

60.     Sergeant Nicastle hereby incorporates by reference all averments in this Complaint.

61.     In seeking to run for office, Sergeant Nicastle was engaging in the constitutionally protected activity of seeking public office protected by the First Amendment to the Constitution.

62.     The Defendants' overtly and implicitly made intimidating and threatening statements to Sergeant Nicastle due to Sergeant Nicastle's exercise of his constitutionally protected conduct.

63.     Moreover, the Defendants made overtly and implicitly defamatory comments about Sergeant Nicastle to others, under circumstances implying that some punishment, sanction or adverse action would imminently follow.

64.     The Defendants' acts of intimidating, threatening, and unlawfully demoting Sergeant Nicastle were motivated by Sergeant Nicastle's exercise of constitutionally protected conduct.

65.     Additionally, Sergeant Nicastle's candidacy for Sheriff of Adams' County is "political speech" that involves a matter of public concern.

66.     Sergeant Nicastle's interest in expressing his candidacy for Adams' County Sheriff outweighs the Defendants' interest in regulating that political speech.

67.     Sergeant Nicastle's expression of his political speech was the substantial factor driving Defendants' decision to demote the Sergeant.

68.     Defendants clearly would not have taken the same employment action of

demoting Sergeant Nicastle if the Sergeant would not have run against Sheriff Darr.

69.     Defendants' actions caused Sergeant Nicastle to suffer injuries that would chill a person of ordinary firmness from continuing to engage in such constitutionally protected activity.

70.     Defendants' conduct violated clearly established rights belonging to Sergeant Nicastle of which reasonable persons in Defendants' position knew or should have known.

71.     Defendants' acts were done under color of state law.

72.     Defendants engaged in the conduct described by this Complaint intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Sergeant Nicastle's federally protected constitutional rights.

73.     Defendants' conduct proximately caused significant injuries, damages and losses to Sergeant Nicastle.

## SECOND CAUSE OF ACTION – 42 U.S.C. §1983 FOURTEENTH AMENDMENT VIOLATION – DENIAL OF DUE PROCESS

74.     Sergeant Nicastle hereby incorporates by reference all averments in this Complaint.

75.     Sergeant Nicastle has a constitutionally protected property and/or liberty interest arising from each term, actual or implied, of his employment or other contracts with the Adams County Sheriff's Office, as set forth in, or evidenced by, the parties' acts and words, the rules and policies of the Adams County Sheriff's Office, and its policies and procedures.

76.     Defendants have violated Sergeant Nicastle's property interest when Sheriff Darr unilaterally amended the policies and procedures of the Adams County Sheriff's Office concerning disciplinary action on command staff in anticipation of demoting Sergeant Nicastle for political purposes.

77.     The Defendants established policies and procedures in connection with their demotion of the Sergeant Nicastle, which were more stringent against command staff personnel, such as Sergeant Nicastle, than due process would otherwise require.

78.     Defendants deprived Sergeant Nicastle of his property arbitrarily, so as to offend notions of fairness and due process in violation of the Colorado Constitution and U.S. Constitution.

79.     Defendants have also violated Sergeant Nicastle's property interest by removing and/or altering Sergeant Nicastle's status at the Adams' County Sheriff's Department.

80.     Here, Sergeant Nicastle's procedural due process claim is based on his recognized property interest (i.e. his status) as a Lieutenant that was demoted to Sergeant.  Unfortunately, Sergeant Nicastle's demotion left him with no adequate post demotion remedies for his only remedy was to Sheriff Darr, the individual that ordered the demotion himself.  Accordingly, Sergeant Nicastle was deprived of his property interest for he was without procedural protections under the Due Process Clause.

81.     Finally, Defendants have violated Sergeant Nicastle's liberty interest when Sheriff Darr made statements that has impugned the good name, reputation, honor, and/or integrity of Sergeant Nicastle; the statements made by Sheriff Darr about

Sergeant Nicastle were false; the statements that were published by Sheriff Darr were to foreclose Sergeant Nicastle' opportunity to become the Sheriff of Adams' County.

82.     Additionally, as alleged and set forth above, the actions of Sheriff Darr has also imposed a stigma upon Sergeant Nicastle which has foreclosed his freedom to take advantage of the employment opportunity of being the Sheriff of Adams' County. Such conduct by Defendants has deprived Sergeant Nicastle of his property and liberty interest which are protected interests under the Colorado Constitution and U.S. Constitution.

### THIRD CAUSE OF ACTION – VIOLATION OF PUBLIC POLICY

83.     Sergeant Nicastle hereby incorporates by reference all averments in this Complaint.

84.     The demotion of Sergeant Nicastle supports a cognizable employment action because it contravened a clear mandate of public policy. *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992) (supporting such a claim where "the employee's performance of an act that public policy would encourage under circumstances where retaliatory discharge is supported by evidence of employer's bad faith, malice, or retaliation").

85.     As a direct and proximate result of such actions, Sergeant Nicastle has suffered damages and losses including, but not limited to, back pay, front pay, loss of benefits, and attendant aspects of employment, loss of reputation in his professional and personal community, humiliation, mental anguish, and emotional distress.

## FOURTH CAUSE OF ACTION – INJUNCTIVE RELIEF

86.    Sergeant Nicastle hereby incorporates by reference all averments in this Complaint.

87.    Sergeant Nicastle must be granted a preliminary injunction against Sheriff Darr and the Department from preventing him for running for public office.   In furtherance of this activity, Sergeant Nicastle is seeking a preliminary injunction against Sheriff Darr and the Department from prohibiting Sergeant Nicastle from attending political and charity functions while on duty or during vacation time, as Department policy allows such attendance so long as employees are available for dispatch calls, Darr himself attends such functions while on duty, and there is a substantial likelihood that Nicastle will prevail on the merits of his Complaint.

88.    Nicastle will suffer irreparable harm in the absence of the injunction.

89.    The threatened harm the threatened harm outweighs any damage the injunction may cause to the party opposing it.  In fact, the only damage that may ensue from an injunction would be to Darr's crusade to prejudice Nicastle in his bid to campaign for Sheriff.

90.    The injunction, if issued, will not be adverse to the public interest.  As stated above, it will be against public policy not to grant an injunction.

91.    A Motion for Injunctive Relief is being filed contemporaneously herewith.

WHEREFORE, Sergeant Nicastle respectfully requests that this Court enter judgment in his favor and against the Defendants and grant:

(a)  Appropriate declaratory and other injunctive and/or equitable relief;

(b) Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering allowed by law in an amount to be determined at trial;

(c) All economic losses allowed by law;

(d) Punitive damages allowed by law and in an amount to be determined at trial;

(e)  Attorney's fees and the costs associated with this action, including those associated with having to defend against the termination case;

(f) Pre- and post-judgment interest at the lawful rate;

(g) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this _4th_ day of April, 2010.

　　　　　　　　　/S/ Donald C. Sisson

Donald C. Sisson
Reid J. Elkus
Emily A. Berkeley
Attorneys for Plaintiff Mark R. Nicastle
ELKUS & SISSON, P.C.
1660 Lincoln Street, Suite 1750
Denver, Colorado 80264
(303)567-7981
(303)832-1188 (fax)

Plaintiff's address:
15371 Perrytown Street
Brighton, CO 80642

## VERIFICATION AND ACKNOWLEDGEMENT

I, Mark R. Nicastle, swear and affirm under oath that I have read the foregoing Verified Complaint and Jury Demand and that the statements set forth therein are true and correct to the best of my knowledge.

Dated this 9th day of April, 2010.

Mark R. Nicastle, Signature

Subscribed and affirmed, or sworn to before me in the County of Denver, State of Colorado, this 9th day of April, 2010.

My commission expires: 12/10/2012

Notary Public